**FILED**

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT

MAR 09 2021

FOR THE DISTRICT OF NEW MEXICO

MITCHELL R. ELFERS
CLERK OF COURT

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                     Cr. No. 20-2037 KG

RICHARD ALLEN CHANDLER,

      Defendant.

MEMORANDUM OPINION AND ORDER

On November 12, 2020, a Grand Jury returned an Indictment against Defendant Richard

Chandler for one count of being a felon in possession of ammunition in and affecting commerce.

(Doc. 15) at 1.  On January 29, 2021, Mr. Chandler filed the instant Motion to Suppress

Evidence (Motion) (Doc. 38).  The Motion is now fully and timely briefed.  *See* (Docs. 48, 52).

On February 23, 2021, the Court held an evidentiary hearing on the Motion to Suppress.  (Doc.

54).  Joni Autrey Stahl and Richard Williams represented the United States, and Amanda Skinner

and David Benatar represented Mr. Chandler, who was present at the hearing.  *Id.* at 1.  Public

Safety Aide Paul Runyon and New Mexico State University Police Lieutenant Jason Dunivan

testified on behalf of the United States.  *Id.* at 1-3.

At the close of the hearing, the Court took Mr. Chandler's Motion under advisement.  *Id.*

at 10.  This written Order detailing the Court's decision follows.  After review of the parties'

briefs, the testimony, the evidence admitted at the hearing, oral argument by counsel, and the

controlling law, the Court denies Mr. Chandler's Motion to Suppress Evidence (Doc. 38).

*I. Factual Findings*

On May 15, 2020, Public Safety Aide (PSA) Paul Runyon was on patrol on the New

Mexico State University (NMSU) campus.  Transcript of Feb. 23, 2021, Motion Hearing at 7.[1]

PSA Runyon's duties on the evening of May 14, 2020, into the early-morning hours of May 15,

2020, included providing NMSU law enforcement personnel with an "extra set of eyes for the

campus." *Id.* at 6.  From 8:00 p.m. to 2:00 a.m., PSA Runyon was responsible for patrolling the

NMSU campus in a marked public safety vehicle, equipped with police lights on the top of the

unit. *Id.* at 8.

At 1:25 a.m., PSA Runyon was driving westbound when he spotted an individual walking

on the sidewalk. *Id.* at 12.  The individual was wearing a dark hoody with "the hood over his

face," and a baseball hat. *Id.* at 13, 16.  PSA Runyon observed the individual enter a restricted

area of campus that contained abandoned apartments. *Id.* at 16.  From his experience with the

NMSU Public Safety Office, PSA Runyon knew that "this area of campus was closed due to

COVID-19 restrictions," "there were signs advising closure of [the entire] campus," and there

was a recent "rise of burglaries and threats in the area." *Id.* at 29.  PSA Runyon watched the

individual for "five to seven seconds" as he walked towards the abandoned apartments and then

"ducked or went into some trees in the area." *Id.* at 16, 27, 29.  At that point, PSA Runyon

radioed NMSU police dispatch to report a suspicious person. *Id.* at 16, 27.

NMSU Police Lieutenant Jason Dunivan arrived on the scene in response to PSA

Runyon's report. *Id.* at 37.  Lieutenant Dunivan served as Deputy Chief of the Las Cruces Police

Department before joining NMSU and has over 24 years of law enforcement experience. *Id.*  At

---

1. The Court's citation to the hearing transcript refers to the court reporter's original
unedited version.  Any final transcript may contain slightly different page numbers.

the time of the call, Lieutenant Dunivan was serving as the Sergeant responsible for overseeing field operations and worked as the patrol supervisor for the graveyard shift. *Id.* As the supervisor on duty, Lieutenant Dunivan was tasked with placing signs around campus to inform the public of the NMSU President's Order, restricting access to campus to only students and faculty members. *Id.* at 95.

When the call arrived reporting the suspicious person, Lieutenant Dunivan was aware of "auto thefts, … property crimes, [] larceny," and "burglaries" near this area of campus. *Id.* at 44, 47. In the area where the individual was reported, Lieutenant Dunivan knew that "doors [had been] kicked [in], … squatters … or vagrants [] had been staying in those buildings" and the Police Department "frequently" received reports of "criminal damage [to] property, breaking or entering," and "numerous reports of where copper … [had] been removed from [the] wall area." *Id.* at 48. Crime had escalated to such a degree in this area that Lieutenant Dunivan and the NMSU Police Department were in the process of implementing a "burglary detail," to increase patrol and locate criminal activity on campus. *Id.* at 46.

When he arrived at the scene in his unmarked vehicle, Lieutenant Dunivan was in a navy-blue uniform, equipped with police patches, a badge, a nameplate, and standard-issue duty gear, including a body camera on his left-breast pocket. *Id.* at 45-46. Lieutenant Dunivan observed the individual "look[] back to see [his] unit" with "his hands in his pocket[s]." *Id.* at 53. As the individual turned to face him, Lieutenant Dunivan saw him clutching a large item in his front-left pant pocket. *Id.*; *see also* (Doc. 48-2) at 1 (Dunivan Police Incident Report) (explaining that he "observed some type of object in his left front pocket"). At this point, Lieutenant Dunivan "initiated [his] emergency equipment" and "illuminated [the individual] with [his] spotlight" and

3

"stepped out" of his patrol unit.  Tr. at 53.  Lieutenant Dunivan introduced himself and asked the

individual to "take his hands out of his pockets."  Lapel video, Def. Exh. A at 00:01-00:05.

  After exiting his patrol unit, Lieutenant Dunivan recognized the individual as Defendant

Richard Chandler.  Tr. at 55, 56; *see also* (Doc. 48-2) at 1 (Dunivan Police Incident Report)

(explaining that he "immediately recognized this subject as Mr. Richard Chandler").  Lieutenant

Dunivan explained that he previously interacted with Mr. Chandler while employed with the

NMSU Police Department "approximately six to eight times."  Tr. at 56.  On several other

occasions, NMSU police officers under Lieutenant Dunivan's supervision interacted with Mr.

Chandler.  *Id.* at 60.  On at least two occasions, Mr. Chandler wielded a sword at officers as they

attempted to execute a misdemeanor warrant for his arrest.  *Id.* at 61-62.  Furthermore, as

recently as April 26, 2020, Mr. Chandler led Lieutenant Dunivan on a foot pursuit after he

attempted to serve a misdemeanor warrant.  *Id.* at 63.

  After recognizing Mr. Chandler in the early-morning hours of May 15, 2020, Lieutenant

Dunivan asked him to sit down on the ground and confirmed his identity.  Lapel video, Def. Exh.

A at 00:10-00:25.  Lieutenant Dunivan "advised Mr. Chandler to sit down on the roadway based

upon [his] previous contacts with him."  (Doc. 48-2) at 1.  By this point, Lieutenant Dunivan

"knew Mr. Chandler had two warrants for his arrest through [his] department."  *Id.*  Specifically,

"as a supervisor on duty" that evening, dispatch informed Lieutenant Dunivan at the start of his

shift that Mr. Chandler had two pending warrants, "one for [] resisting [arrest] and one … for

failure to appear on a harassment case."  Tr. at 65.  Both warrants were issued "by Magistrate

Court," on his Department's original charges.  *Id.*

  Upon recognizing Mr. Chandler, Lieutenant Dunivan intended to "place him under arrest

due to the outstanding warrants."  *Id.* at 65-66.  In addition, Lieutenant Dunivan knew that Mr.

Chandler had previously "been issued a no trespass directive" to not appear in this area of the NMSU campus. *Id.* at 66. Based on the "no trespass directive," Lieutenant Dunivan had the authority to "criminally cite[]" or charge Mr. Chandler's presence on campus as "criminal trespass." *Id.* at 68.

As Mr. Chandler was seated on the sidewalk, Lieutenant Dunivan asked if he had any weapons on him, to which Mr. Chandler responded, "no." Lapel video, Def. Exh. A at 00:33. Lieutenant Dunivan informed Mr. Chandler that he was "going to put [him] In handcuffs," and advised him that "if he tries to run or fight," he will "tase him." *Id.* at 00:49-00:53. Lieutenant Dunivan then explained to Mr. Chandler that there was a warrant pending for his arrest. *Id.* at 00:58.

Lieutenant Dunivan asked Mr. Chandler to "get up and turn around," repeatedly requesting that Mr. Chandler "relax," as he placed him in handcuffs. *Id.* at 01:00-02:00. Once handcuffed, Lieutenant Dunivan asked Mr. Chandler to spread his legs, and began emptying his pockets. *Id.* at 02:40-04:20. A large metal pipe, the previously unidentified item that Lieutenant Dunivan saw from his police unit, was removed from Mr. Chandler's front-left pant pocket. *Id.* Lieutenant Dunivan asked Mr. Chandler if he had "any needles" or "anything that's going to stick [him]." *Id.* at 04:45. Mr. Chandler responded "probably," and explained that he may have some "nails" in his front-right pocket. *Id.* at 04:48-05:00.

As Lieutenant Dunivan continued to empty Mr. Chandler's pockets, he again explained that there is "a warrant for [his] arrest." *Id.* at 05:45. As he transitioned from emptying Mr. Chandler's front-left pocket to the front-right pocket, Lieutenant Dunivan asked Mr. Chandler about the "nail" he described earlier. Mr. Chandler responded that "maybe it wasn't a nail." *Id.* at 07:10-07:17. Lieutenant Dunivan then discovered a single .22 misfired bullet in Mr.

5

Chandler's pocket. *Id.* at 07:17-07:40. Mr. Chandler was later charged by Indictment in this case as a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) for the .22 bullet in his pocket. *See* (Doc. 16).

 *II. Standard*

 For evidence to be suppressed, the defendant must first demonstrate that his Fourth Amendment rights have been violated. *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006). After the defendant demonstrates that the Fourth Amendment was implicated, "the government has the burden of proving its warrantless actions were justified." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020); *see also United States v. Torres*, 987 F.3d 893, at 901 (10th Cir. 2021) (citing *United States v. Ybarra Cruz*, 982 F.3d 1284, 1291 (10th Cir. 2020)) (clarifying district court's standard of review for motion to suppress). If a warrantless search and seizure are unjustified, the government must "prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).

 In deciding a motion to suppress, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented…." *Goebel*, 959 F.3d at 1265. When making factual findings on a motion to suppress, the Court "evenhandedly" considers the evidence. *Torres*, 987 F.3d 893 at 899 (citing *United States v. Finefrock*, 668 F.2d 1168, 1171 (10th Cir. 1982)). Any "inferences the district court draws from that evidence and testimony are entirely within its discretion." *Goebel*, 959 F.3d at 1265 (citing *United States v.*

6

*Andrus*, 483 F.3d 711, 716 (10th Cir. 2007); *United States v. Kimoana*, 383 F.3d 1215, 1220

(10th Cir. 2004)).

    *III. Discussion*

    Mr. Chandler presents two arguments in favor of suppression of the .22 bullet. *See* (Doc.

38). First, he alleges that Lieutenant Dunivan did not have reasonable suspicion to prompt his

initial detention. *Id.* at 3-5. Second, he contends that Lieutenant Dunivan did not possess

reasonable suspicion to believe that he was armed and dangerous to justify the pat-down search.

*Id.* at 5-7. As a result of this unlawful search and seizure, Mr. Chandler argues that the

exclusionary rule forbids the use of the .22 bullet at trial. *Id.* at 7-8.

    In response, the United States contends that Lieutenant Dunivan had probable cause and

reasonable suspicion to detain Mr. Chandler and arrest him. (Doc. 48) at 5. However, the

United States argues, even if Mr. Chandler's initial detention was unlawful, the existence of his

two outstanding arrest warrants "attenuated the connection" between the unlawful stop and the

discovery of the evidence. *Id.* at 5-8. Under either scenario, the United States contends, Mr.

Chandler was lawfully searched pursuant to the "search incident to arrest" exception. *Id.* at 8-9.

In the absence of this exception, however, the United States argues that Lieutenant Dunivan

possessed reasonable suspicion to believe Mr. Chandler was armed and dangerous, justifying his

pat-down search. *Id.* at 12-14.

    *A.  Whether Lieutenant Dunivan Possessed Reasonable Suspicion to Initially
Detain Mr. Chandler for Investigatory Purposes*

    The parties agree that Lieutenant Dunivan detained Mr. Chandler under the Fourth

Amendment prior to identifying him. *See* Tr. at 69 (explaining that Lieutenant Dunivan

"detained" Mr. Chandler when he "stopped [his] unit and turned on the spotlight"); *id.* at 99-100

(agreeing that "there's [no] argument that [Mr. Chandler] was seized from the beginning of the

encounter" when Lieutenant Dunivan "spotlighted him [and] stopped his unit"). The Court agrees with the parties' assessment on the time of seizure. *See United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (explaining that "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained"). Principally, Lieutenant Dunivan and PSA Runyon both positioned their vehicles to prevent Mr. Chandler from walking away. *See* Tr. at 16. There is no question that Mr. Chandler's liberty was curtailed, such that he was not free to leave the scene. *See Mendenhall*, 446 U.S. at 554 (explaining that "person has been 'seized' [when] … a reasonable person would have believed that he was not free to leave"). The Court's inquiry, therefore, focuses on what Lieutenant Dunivan knew before he recognized Mr. Chandler, and whether he possessed reasonable suspicion at that moment to effectuate the stop.

An officer may briefly stop an individual for investigatory purposes if the officer possesses "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). The officer must have "reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003). In determining whether an officer had reasonable suspicion, a court considers "the totality of the circumstances … in light of common sense and ordinary human experience." *Simpson*, 609 F.3d at 1146. This evaluation is "made from the perspective of the reasonable *officer*, not the reasonable *person*." *Id.* at 1147 (emphasis in original). Resultingly, the reasonable suspicion calculus is based on an objective standard, rather than the subjective belief of the officer. *United States v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013) (observing that "existence of reasonable suspicion … is measured

8

from the perspective of an objectively reasonable officer, not from the subjective perspective of the particular officer on scene").

In support, the officer "must point to specific, articulable facts … [i]nchoate suspicions and unparticularized hunches do not provide reasonable suspicion." *Simpson*, 609 F.3d at 1147. The level of suspicion required, however, "is considerably less than proof by a preponderance of the evidence or that required for probable cause." *United States v. McHugh*, 639 F.3d 1250, 1255–56 (10th Cir. 2011) (internal quotation marks and brackets omitted). Ultimately, the Court's evaluation of reasonable suspicion takes "into account an officer's reasonable inferences based on training, experience, and common sense." *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007).

The days and hours before Mr. Chandler's detention contributed to Lieutenant Dunivan's reasonable suspicion calculus. Principally, Lieutenant Dunivan knew that the area where the suspicious person was spotted contained abandoned housing, unoccupied and uninhabited for four or five years. Tr. at 39. This area of campus was closed, and no residents or students lived in the surrounding apartments. *Id.* Lieutenant Dunivan knew that crime had recently increased in the area, including theft of copper piping, bicycles, and automobiles. *Id.* at 44-48. Crime had become so prevalent in this section of campus that Lieutenant Dunivan and his staff were increasing their patrol, and in the early stages of creating a "burglary detail." *Id.* at 44. Lieutenant Dunivan was also aware of the mandate issued by the NMSU President, prohibiting visitors and guests on the NMSU campus to slow the spread of COVID-19. *Id.* at 39.

When he arrived at the scene of the suspicious person, Lieutenant Dunivan observed Mr. Chandler "briefly look[] over his shoulder" at his police unit. *Id.* at 53. It was a "warm" May morning, around 1:30 a.m. *Id.* at 13. Lieutenant Dunivan observed Mr. Chandler wearing a

hooded sweatshirt and baseball hat, with a large object in his front pocket. *Id.* at 53. In addition, PSA Runyon previously observed Mr. Chandler "duck" into a row of trees, and "turn around" after seeing his marked police vehicle. *Id.* at 10, 12. The information PSA Runyon possessed that led him to report Mr. Chandler as a "suspicious person" is imputed to the broader reasonable suspicion calculus. *See United States v. Chavez*, 534 F.3d 1338, 1345-46 (10th Cir. 2008) (explaining that officers may rely on "vertical collective knowledge").

The time of day, Mr. Chandler's behavior, the neighborhood, the campus closure, the recent string of burglaries and thefts, including theft of copper piping, and the large object identified in Mr. Chandler's front-pocket, provided Officer Dunivan reasonable suspicion to briefly detain him to further investigate. Specifically, the location as a "high-crime area," the fact that the incident occurred "undoubtedly late enough (or early enough)" in the day to raise concern, and Mr. Chandler's "lurking" behavior, each added to the reasonable suspicion calculus. *See McHugh*, 639 F.3d at 1257-58. When considered within the totality of the circumstances, each of these factors support the Court's conclusion that Lieutenant Dunivan had reasonable suspicion to briefly detain and question Mr. Chandler to solicit further information. *See id.* at 1256 (directing court to consider "'totality of the circumstances,' rather than assessing each factor or piece of evidence in isolation").

In sum, the Court concludes that Lieutenant Dunivan, based on his experience and knowledge of the area, possessed reasonable suspicion to believe that "criminal activity 'may be afoot.'" *See Quintana-Garcia*, 343 F.3d at 1270. Indeed, a reasonable officer in Lieutenant Dunivan's position, armed with this knowledge and 24 years of law enforcement experience, could reasonably believe that Mr. Chandler's brief detention was necessary to investigate his

presence in the area. As a result, the Court concludes that Mr. Chandler's initial investigative

detention did not violate the Fourth Amendment.

### B. Whether the Attenuation Doctrine Applies

Notwithstanding the above conclusion, the Court notes that even if Lieutenant Dunivan

did not possess reasonable suspicion to support Mr. Chandler's initial detention, the attenuation

doctrine applies to bar exclusion of the evidence. Under the attenuation doctrine, "[e]vidence is

admissible when the connection between unconstitutional police conduct and the evidence is

remote or has been interrupted by some intervening circumstance, so that 'the interest protected

by the constitutional guarantee that has been violated would not be served by suppression of the

evidence obtained.'" *Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016) (quoting *Hudson v. Michigan*,

547 U.S. 586, 593 (2006)). Specifically, the attenuation doctrine applies in intervening

circumstances, such as "the discovery of a valid, pre-existing, and untainted arrest warrant." *Id.*

In determining whether the attenuation doctrine applies in a specific case, a court should

consider: (1) "the temporal proximity between the unconstitutional conduct and the discovery of

evidence to determine how closely the discovery of evidence followed the unconstitutional

search"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of

the official misconduct." *Id.* at 2062. In its brief and during the hearing, the United States

conceded that the first factor favors suppression. *See* (Doc. 48) at 7; Tr. at 103. Conversely, Mr.

Chandler conceded that the second factor favors the United States. *See* Tr. at 113. Nevertheless,

the Court analyzes each prong individually.

Under the first factor, "substantial time" ordinarily must elapse "between an unlawful act

and when the evidence is obtained." *Strieff*, 136 S.Ct. at 2062 (citing *Kaupp v. Texas*, 538 U.S.

626, 633 (2003)). "Only minutes after the illegal stop," or "a short time interval" favors

suppression of the evidence. *Id.* Here, less than eight minutes elapsed between Lieutenant Dunivan's initial detention of Mr. Chandler and the discovery of the .22 bullet. *See* (Lapel video, Def. Exh. A) at 00:01-07:40. Two cases cited by the *Strieff* Court are particularly informative of this Court's consideration.

First, in *Kaupp*, the Court concluded that "substantial time" had not passed between the defendant's "removal from his home in handcuffs and his confession after only 10 or 15 minutes of interrogation." *Kaupp*, 538 U.S. at 633. Similarly, in *Brown*, the Court concluded that the officer's discovery of evidence and the defendant's illegal arrest were separated by "less than two hours[.]" *Brown v. Illinois*, 422 U.S. 590, 604 (1975). The *Brown* and *Kaupp* Courts both concluded that neither "10 or 15 minutes" nor "less than two hours" could serve as "substantial time" for purposes of dissipating the taint between the illegal conduct and the discovery of evidence. *See Kaupp*, 538 U.S. at 633; *Brown*, 422 U.S. at 604. Thus, here, with under eight minutes between the allegedly illegal conduct and the discovery of the evidence, this factor weighs in favor of suppressing the evidence.

Under the second factor, "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is sufficiently attenuated to dissipate the taint." *Strieff*, 136 S.Ct. at 2062 (citing *Segura v. United States*, 468 U.S. 769 (1984)). In *Strieff*, as here, "the warrant was valid, it predated [the] [o]fficer['s] [] investigation, and it was entirely unconnected with the stop." *Id.* Lieutenant Dunivan's knowledge of Mr. Chandler's outstanding arrest warrants occurred upon identifying him, after he initiated his detention. Tr. at 94. The *Strieff* Court explained that the officer's "arrest of [the defendant] thus was a ministerial act that was independently compelled by the pre-existing warrant." *Id.* at 2063. As a result, here, like in *Strieff*, the second factor favors the United States.

12

Finally, the third factor promotes the rationale of deterring police misconduct "by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Id.* This factor considers whether the "unlawful stop was part of any systemic or recurrent police misconduct." *Id.* The *Strieff* Court explained that "errors in judgment hardly rise to a purposeful or flagrant violation" of a defendant's Fourth Amendment rights. *Id.* In rejecting the defendant's counterarguments, the Court explained that "there is no indication that [the officer's] unlawful stop was part of any systemic or recurrent police misconduct." *Id.*

Here, Mr. Chandler alleges that Lieutenant Dunivan "demonstrated a pattern of unconstitutional conduct including the intrusive and unjustified pat-down search." (Doc. 52) at 2. During the hearing, counsel further argued that "[t]he search kept going past the point where Lieutenant Dunivan's concerns about weapons would have been alleviated… It kept going past the point where Mr. Chandler's pockets were turned out, where the pipe was pulled out." Tr. at 113. The Court is unpersuaded by this argument.

The pat-down search lasted approximately five minutes. *See* (Lapel video, Def. Exh. A) at 02:40-07:40. From the moment Mr. Chandler was stopped, until he was placed in the back of the police unit, less than ten minutes elapsed. *See id.* at 00:01-09:20. In addition, Mr. Chandler's contention that the search "kept going past the point … where the pipe was pulled out," ignores the information that he conveyed to Lieutenant Dunivan. Indeed, Lieutenant Dunivan specifically asked Mr. Chandler if he had "any needles" or "anything that's going to stick [him]" in his pockets. *Id.* at 04:40. To this inquiry, Mr. Chandler responded, "probably." *Id.* at 04:40-:05:00. Mr. Chandler then explained that he may have some "nails" in his front-right pocket. *Id.*

After discovering the pipe in Mr. Chandler's front-left pocket, Lieutenant Dunivan was not required to stop the pat-down search—holding otherwise would be antithetical to officer safety concerns. On the contrary, Mr. Chandler provided information that additional items, threatening to officer safety, would be found in his front-right pocket, where the .22 bullet was discovered. As a result, there is nothing flagrantly unreasonable about Lieutenant Dunivan's pat-down search, especially considering the information Mr. Chandler relayed to him, the length of the search, and the information he possessed about Mr. Chandler's prior violent confrontations with law enforcement.

Next, Mr. Chandler contends that "the stop itself, stopping someone for observably innocent behavior … leads to the third factor weighing in the defense's favor." Tr. at 114. The Court disagrees. Principally, even if reasonable suspicion did not support Lieutenant Dunivan's stop of Mr. Chandler, the circumstances do not evidence "systemic or recurrent police misconduct." *See Strieff*, 136 S.Ct. at 2063. At most, in the absence of reasonable suspicion, Lieutenant Dunivan's conduct was negligent, considering the information conveyed to him and the knowledge he possessed. There are no facts to establish that his conduct rose to the level of "purposeful or flagrant" misconduct. *See id.* at 2064 (explaining that "[f]or the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure"). Therefore, the final *Strieff* factor favors the United States.

Nevertheless, and not argued by counsel, the Court considered Lieutenant Dunivan's testimony that he has stopped "thousands" of people to question them about their presence on NMSU's campus. *See* Tr. at 95. However, absent additional information regarding the viability of these seizures, the Court lacks the requisite evidentiary foundation to conclude that this conduct is flagrant or purposeful. *See Strieff*, 136 S.Ct. at 2064 (explaining that "[w]ere

14

evidence of a dragnet search presented here, the application of the [] factors could be different"). Simply stated, there is no evidence that such concerns exist for the Court to reach a finding of flagrant misconduct on this basis.

In conclusion, "although the illegal stop was close in time to [Mr. Chandler's] arrest, that consideration is outweighed by two factors supporting the [United States]." *See Strieff*, 136 S.Ct. at 2063. Lieutenant Dunivan's subsequent recognition of Mr. Chandler, and his knowledge that he possessed outstanding arrest warrants, "broke the causal chain" between any purportedly unconstitutional stop "and the discovery of evidence." *See id.* Thus, even in the absence of reasonable suspicion to effectuate the stop, the Court denies Mr. Chandler's contention that his seizure ran afoul of the Fourth Amendment.

### C. Whether the Search Qualifies as a "Search Incident to Arrest"

Next, after concluding that the seizure of Mr. Chandler was proper, the Court considers whether Lieutenant Dunivan's search was constitutional. Ordinarily, "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *See Riley v. California*, 573 U.S. 373, 383 (2014) (collecting cases and explaining post-*Arizona v. Gant* application of search incident to arrest exception). This search is reasonable even if "there was no concern about the loss of evidence, and the arresting officer had no specific concern that [the suspect] might be armed." *Id.* at 384. As a result, a "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Id.*; *see also Strieff*, 136 S.Ct. at 2063 (explaining that once officer was authorized to arrest under attenuation

doctrine "it was undisputedly lawful to search [the individual] as an incident of his arrest to protect [the officer's] safety").

Here, there is no dispute that the outstanding arrest warrants were valid and provided Lieutenant Dunivan authority to arrest Mr. Chandler after confirming his identity and the outstanding warrants with dispatch.  Tr. at 113.  As a result, Lieutenant Dunivan was permitted to conduct a reasonable search of Mr. Chandler to remove any weapons before placing him in the police unit as a search incident to arrest.  *See Riley*, 573 U.S. at 384.  Thus, under the search incident to arrest exception, Lieutenant Dunivan's pat-down search of Mr. Chandler was lawful.

### D.  Whether the Search was Based on Reasonable Suspicion

Even if Lieutenant Dunivan was not granted authority to search Mr. Chandler by the search incident to arrest exception, the search is permissible on the basis of reasonable suspicion. Under this alternative, an officer must possess reasonable suspicion that the individual is armed and dangerous to effectuate a pat-down search in accord with the Fourth Amendment.  *United States v. Rodriguez,* 739 F.3d 481, 491 (10th Cir. 2013).  Reasonable suspicion under this calculus must provide a "reasonably prudent [officer] in the circumstances" with a warranted belief that "his safety or that of others was in danger."  *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012).

Here, several facts informed Lieutenant Dunivan's reasonable suspicion calculus to suspect Mr. Chandler was armed and dangerous.  First, Lieutenant Dunivan noticed a "large bulge" in Mr. Chandler's front-left pocket.  Tr. at 53.  Second, when previously attempting to execute an arrest warrant, Lieutenant Dunivan saw Mr. Chandler become "upset" and hit a "sword on various different walls inside [his] apartment complex."  *Id.* at 61.  Third, Mr. Chandler repeatedly refused to submit to police custody.  On one occasion, he refused to comply

with Lieutenant Dunivan's request and, instead, "slammed the door." *Id.* On a separate occasion, Mr. Chandler led Lieutenant Dunivan on a foot pursuit and became "extremely upset." *Id.* at 63. In response, Lieutenant Dunivan displayed his Taser and advised Mr. Chandler that "he would be tased if he continued to fight or escalate the situation." *Id.* Lieutenant Dunivan went "hands on" and grabbed Mr. Chandler's arm "to place him into custody" with a "firm grip." *Id.*

While a sword would not fit in Mr. Chandler's pocket, and fleeing does not necessarily evidence an individual's propensity to violence, these encounters illustrate that Mr. Chandler is willing to disobey law enforcement and use any means necessary to effectuate his escape. With this knowledge in mind, Lieutenant Dunivan was reasonable in suspecting Mr. Chandler may have been armed and dangerous on May 15, 2020. Indeed, Lieutenant Dunivan's knowledge of Mr. Chandler's "criminal history contributes powerfully to the reasonable suspicion calculus." *See Simpson*, 609 F.3d at 1147. This factor "may cast a suspicious light on other seemingly innocent behavior." *Id.*; *see also United States v. Hammond*, 890 F.3d 901, 907 (10th Cir. 2018) (explaining that where "circumstances of the stop itself interact with an individual's criminal history to trigger an officer's suspicions, that criminal history becomes critically relevant for *Terry*-purposes").

Moreover, the Court is unpersuaded by Mr. Chandler's contention that because he was "cooperative, polite, and non-threatening" on the evening of the incident, there was no reason for Lieutenant Dunivan to suspect he would be armed and dangerous. *See* (Doc. 52) at 4. Rather, "the pleasant tone didn't eliminate the risk that Mr. [Chandler] might resort to violence to prevent a pat-down search." *Torres*, 987 F.3d 893 at 904 (collecting cases). Simply stated, Mr. Chandler's "cooperative" tone on May 15, 2020, did not curtail Lieutenant Dunivan's reasonable

17

suspicion to believe that he might become upset, resist arrest, or act violently.  *See Terry v. Ohio*, 392 U.S. 1, 13 (1968) (explaining that some "hostile confrontations … begin in a friendly enough manner, only to take a different turn…").

In conclusion, based on Mr. Chandler's prior interactions with law enforcement, his history of resisting arrest, and the large object visible in his pocket, Lieutenant Dunivan possessed reasonable suspicion to believe that Mr. Chandler may have been armed and dangerous.  As a result, the Court concludes that Lieutenant Dunivan's pat-down search of Mr. Chandler complied with the Fourth Amendment.  On this basis, the evidence discovered during the search is admissible.

*IV. Conclusion*

In summary, the Court concludes that Lieutenant Dunivan had reasonable suspicion to briefly detain Mr. Chandler, before recognizing him, and inquire as to his presence on campus. After confirming Mr. Chandler's identity, and knowing about his preexisting arrest warrants, Lieutenant Dunivan was authorized to effectuate his arrest.  As a result, Lieutenant Dunivan lawfully conducted a search incident to arrest before placing Mr. Chandler in the police unit.

Alternatively, even if Lieutenant Dunivan lacked reasonable suspicion to initially detain Mr. Chandler, his subsequent confirmation of Mr. Chandler's identity and his outstanding arrest warrants "dissipated the taint" of his unconstitutional conduct, pursuant to the attenuation doctrine.  Under this scenario, Lieutenant Dunivan would likewise be authorized to search Mr. Chandler to alleviate concerns over officer safety.

Notwithstanding either of these conclusions, even if the search incident to arrest exception was inapplicable, Lieutenant Dunivan was authorized to conduct a pat-down search because he possessed reasonable suspicion that Mr. Chandler was armed and dangerous.  As a

result, Mr. Chandler's current request for suppression of the .22 bullet lacks merit.  For each of these reasons, Mr. Chandler's present Motion must be denied.

IT IS THEREFORE ORDERED that the Motion to Suppress Evidence (Doc. 38) is properly denied.

UNITED STATES DISTRICT JUDGE